IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ANNGELYNN P. & EDRICH P.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ANNGELYNN P. & EDRICH P., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

TREVOR P., APPELLANT.

Filed August 15, 2023.    Nos. A-22-907, A-22-908.

Appeals from the County Court for Dawson County: JEFFREY M. WIGHTMAN, Judge. Affirmed.

Derek L. Mitchell, for appellant.

No appearance for appellee.

R. Hayley Huyser, of Hart, Huyser & Miller, P.C., L.L.O., guardian ad litem.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Trevor P. appeals from the county court for Dawson County sitting as the juvenile court which terminated Trevor's parental rights to his two children, Edrich P. and Anngelynn P. Trevor challenges the juvenile court's findings with regard to both the statutory grounds for termination and the best interests of the children. For the reasons that follow, we affirm.

- 1 -

BACKGROUND

On March 5, 2021, the State filed a juvenile petition alleging that Anngelynn and Edrich were children as defined by Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2022), to wit they were children

who are homeless or destitute, or without proper support through no fault of their parent; . . . lack proper parental care by reason of the fault or habits of their parent . . . whose parent . . . neglects are refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juveniles; or who are in a situation or engage in an occupation dangerous to life or limb or injurious to the health or morals of such juveniles.

Trevor was identified as the custodial parent of the children. The children's mother, Shanna P., was also listed on the petition, however, her parental rights are not at issue in this appeal, and she will be discussed only as necessary to resolve Trevor's claims.

The juvenile court entered an ex parte order placing the children in the temporary custody of the Nebraska Department of Health and Human Services (DHHS). The court noted in that order that law enforcement had conducted a welfare check on the children in response to a report from Shanna that Trevor was homeless and without employment. The children were located at their grandparents' home in Cozad, Nebraska, but Trevor was not present. Both children were reported to be "dirty" and "had a bad odor about them," and the conditions of the home were reported to be "cluttered and dirty" with "a strong odor of dog feces and urine throughout the house."

Responding officers determined to remove the children based upon the "unlivable condition of the house." Trevor reportedly "arrived at the police station irate and unwilling to have a conversation with the authorities . . . yelling and swearing and causing a scene." The children were placed in the care of Nicholas B. and Michaela B., a foster family well acquainted with the children due to a prior placement and continued contact thereafter. The children remained placed with Nicholas and Michaela throughout the remainder of the juvenile court proceedings.

Trevor appeared before the juvenile court and entered a plea of denial to the allegations in the juvenile petition. The juvenile court ordered DHHS to arrange for "reasonable visitation" between Trevor and the children. On May 3, 2021, DHHS caseworker, Diana Lopez, wrote a letter advising the court that monthly supervised visitation would be set up shortly. However, on May 13, Lopez wrote another letter advising the court that supervised visitation would be "stopped immediately due to the therapeutic recommendation" of Edrich's therapist, Jason Dillard.

Dillard subsequently wrote a letter explaining that Edrich had been exhibiting "significant and problematic behavior at his daycare and preschool." Dillard noted a correlation between an increase in these behaviors and an increase in visitation with his parents, adding that such "is an indicator that [Edrich] feels unsafe when he is around [his parents] . . . and he goes into a survival mode focusing on protecting himself." Thus, Dillard was "strongly advocating . . . that all visits stop occurring with both parents until a confirmed change can be measured either through substance testing, individual counseling, stability in their personal lives, or something else along those lines." Dillard further indicated he was open to facilitating therapeutic visits with either or both parents.

The evidence adduced at the adjudication hearing revealed that Trevor had been evicted from his home and that the children went to stay, at least temporarily, with Trevor's parents in the home where law enforcement discovered them on March 5, 2021. Responding officer, Thomas Twyford, testified to his observations of the conditions in the home and his ultimate decision to remove the children out of concern for their safety. DHHS' initial assessment worker, Victoria McDonald, testified that she first made contact with the children at the police station and they both "appeared dirty . . . [t]heir hair was unkempt . . . I believe that [Anngelynn] had lice at the time." Michaela later confirmed that when the children were placed with her, they "were very dirty . . . smelled badly . . . both had very severe cases of lice . . . [and] they were very frequently ill with runny noses and coughs and throwing up."

McDonald recalled that Trevor "was extremely upset" when he arrived at the police station, and he "was yelling . . . yanking open the doors . . . [and] you could hear him hitting stuff when he was outside the police station." In light of Twyford's observations of the home and Trevor's behavior, McDonald determined that it was necessary to remove the children for "at least" 48 hours. Following her initial assessment, McDonald testified that she handed the case off to DHHS caseworker, Kylee Hoffmaster.

Hoffmaster testified to previous involvement with this family, including the temporary removal of Edrich in 2016 and a subsequent intake in July 2020. Hoffmaster testified that DHHS received an additional intake in February 2021, regarding concerns of the living conditions in Trevor's home. Hoffmaster recalled some of those concerns being "cigarette butts, other items of drug paraphernalia laying around the home, as well as rotten food on the floor and the table that were accessible to the children." Hoffmaster nevertheless determined that the children were safe at that time because Trevor "had a friend at the home who was willing to clean up some of the things that were of a concern . . . and was able to also assist in caring for the kids because [Trevor] was visibly upset at the time of contact."

Hoffmaster testified that in the present case, after "multiple phone calls" and nearly two weeks, Trevor came to her office to discuss the juvenile petition that had been filed. At that time, Trevor did not provide an address for a permanent residence and stated only that he "was staying with a friend in Kearney . . . [t]hat was the most information that he would provide me." Hoffmaster recalled that "[w]hen I tried to address concerns with him, he became visibly upset, left the office, and I didn't hear back from him for several days." With respect to employment, Trevor informed Hoffmaster that he was not employed, and he explained that "due to COVID and some issues with being ill and the children being ill [he] had been laid off and had not found employment since the layoff."

Hoffmaster testified that she attempted to discuss the services available "to help [Trevor] reunify with the children" but that Trevor "became upset when I began to talk with him about the concerns for mental health and the conditions of the home, employment, housing, and then he left the office." Hoffmaster recalled that Trevor was "shaking, teary-eyed, [and] started to raise his voice." This was concerning to Hoffmaster because it "was similar behavior that I had seen when I had met with [Trevor] in February." Hoffmaster testified that to her knowledge, as of the adjudication hearing, Trevor still had not provided DHHS with a permanent address.

DHHS caseworker, Lopez, testified that she took this case over from Hoffmaster around May 1, 2021. Lopez testified to the letters discussed above regarding the status of visitation

between Trevor and the children. In addition to the content of the letters, Lopez noted that Trevor's address in the DHHS system remained his parents' address where the children were discovered in March. With regard to Lopez's attempts to contact Trevor after becoming the case manager, she testified that she "tried to call him. I would leave him voicemails, and I also would send him text messages." Lopez testified that when she did make contact with Trevor, he stated he was living in Kearney but did not provide an address.

The juvenile court adjudicated the children under § 43-247(3)(a) and found that they should remain in their current placement. The court further ordered Trevor to work with DHHS to move forward with therapeutic visitation as referenced in Dillard's letter to the court and ordered DHHS to pay for "any evaluations" that Trevor was willing to participate in.

The next hearing occurred on June 30, 2021. The court received the DHHS case plan and court report dated June 25, 2021. Therein DHHS reported that therapeutic visitation had been arranged with Dillard and that Trevor "attended one visit, unannounced" on June 2, 2021. Dillard reported to DHHS that he had a conversation with Trevor following that session in which Trevor seemed to be "blaming the department for his situation" and "implying he was not interested in working with the department." Dillard further reported that Edrich "had behaviors" at daycare after the visit, and Dillard again requested that visitation stop "to help Edrich with his behaviors as well as Trevor to address his mental health needs before progressing back to visitation." DHHS further reported supplying Trevor with referrals for mental health evaluations, but that evaluation had not been done.

The guardian ad litem for the children, Hayley Huyser, also prepared a report dated June 30, 2021. Therein, Huyser opined that "Trevor is in denial that this case is even needed" and reported that he spent the majority of the most recent team meeting "arguing and talking over everyone." Huyser believed it was "evident that Trevor needs therapeutic care before he is capable of parenting his children and maintaining that role." Huyser advocated for suspending supervised visitation until Trevor made therapeutic progress and "Edrich's behaviors are no longer impacted by seeing his dad."

At a hearing in September 2021, the juvenile court received the DHHS case plan and court report dated September 28, 2021. Therein, DHHS reported that supervised visitation had started again at the end of August 2021, after being suspended over the summer. Visits reportedly went well, although it was also reported that both children began experiencing incontinence both before and during visits, and Edrich had been "more anxious" since visits began. DHHS noted that the concerns regarding the children's behavior arose only after visits with Trevor recommenced. DHHS further reported that Trevor had completed an "urgent needs assessment" and was recommended to seek individual counseling. While Trevor started seeing a therapist, he was reported to be "not consistent with the counseling," as his last visit was on July 13, 2021.

Huyser similarly noted a regression in the children's behavior "since reintroducing visits." While Huyser stopped short of recommending that visits be suspended again, she noted that "the team is watching closely to ensure we are providing the needed supports to the kids before and after visits." Huyser further reported as follows:

> I have no doubt that Trevor loves his children, however, he has continually put them in unsafe situations that have caused severe harm to them emotionally. We have not seen any improvements made as to Trevor's mental health and question his stability due to his

most recent job changes, vehicle issues, and arrests. [Dillard] suggests that the children's emotional health will not improve with their father and continued visits until Trevor is on the path to getting healthy. We are still not certain where he is living and visits continue to be out in the community. Trevor is still in denial as to why this case came into care. Team meetings are largely unproductive as Trevor is incredibly defensive and combative with the team. I am hopeful that Trevor seeks counseling and takes it seriously.

At the next hearing in January 2022, the juvenile court received the DHHS case plan and court report dated December 22, 2021. Therein, in addition to reiterating its prior recommendations, DHHS added a recommendation that Trevor "show sobriety for 90 days." DHHS reported that Trevor began weekly drug testing on December 5, 2021, and the first results were positive for "THC and Methamphetamine." Trevor reported that THC was not a problem and was "the only coping skill that helps him with his anxiety." Trevor's theory as to the methamphetamine was "that his neighbors might [be] using methamphetamine and it is seeping through the walls."

DHHS further reported that Trevor was "attending therapy consistently on a weekly basis" and "his treatment plan is working on getting his kids back." Although, DHHS reported the following from Trevor's therapist:

Trevor has been angry in sessions recently due to not feeling heard . . . she has worked with Trevor on other coping skills but Trevor is adamant about them not working for him. . . . [A]nything she has mentioned for Trevor to try he says doesn't work and Trevor stated that if he is able to buy CBD in the stores there should be no issues with it . . . she talked about THC not being legal and how that could affect Trevor and his goals on getting the kids back.

Huyser reported that visits appeared to be going well. However, Huyser also noted Trevor's positive drug test, adding that drug testing was ordered following a criminal charge of marijuana possession. Huyser ultimately reported that "I am not convinced Trevor is able or willing to make the changes necessary to provide safe, stable environment for his children." Huyser emphasized Trevor's "expressed need for coping with CBD oil that contains THC, his continued defensiveness with the team regarding his needs and those of his children, [and] his erratic behaviors at team meetings." Huyser requested that the juvenile court order a co-occurring evaluation "regarding [Trevor's] mental health and substance abuse."

At the next hearing in March 2022, the court received the DHHS case plan and court report dated March 22, 2022. Therein, DHHS reported that Trevor had progressed to "9 hours a week of [supervised] parenting time" to occur "at his apartment in Grand Island." DHHS reported that "the team would like to see Trevor address his mental health before considering unsupervised visitation." Trevor's therapist reported to DHHS on March 17, 2022, that Trevor "has not been consistent and the last time she spoke to him was [February 15]." Otherwise, the therapist did not have much to report to DHHS, "as she believes counseling is not beneficial for Trevor due to him feeling his ways are the right ways and nothing else will work . . . it is difficult for him to take any responsibility . . . she feels [Trevor] is not honest at all." Huyser's guardian ad litem report echoed

the reports of DHHS and emphasized Trevor's unaddressed mental health needs and reluctance to accept responsibility.

In addition to receiving the March 2022 court reports, the juvenile court heard the testimony of Dillard, DHHS caseworker, Olivia Prentice, and Trevor. Prentice testified that Trevor had made "minimal" progress toward unsupervised visitation and that the approved parenting time would cease due to Trevor moving out of his Grand Island apartment and planning to live "with a friend" in Kearney.

Dillard testified that the instability in Trevor's behavior and circumstances was an ongoing cause of anxiety in Edrich. While Dillard believed that Edrich had made significant progress in understanding and processing his emotions, Edrich continued to report a sense of instability and unpredictability with respect to Trevor. Dillard described Edrich's attachment to his father as "ambivalent or resistant" meaning that Edrich "knows that his father has been the [sic] majority of his time throughout his life; however, it has not been consistently safe for Edrich." Dillard observed that Edrich had been coming home from visits with "stomachaches," and Dillard testified that he had come to understand those stomachaches "as a physical representation of anxiety." Dillard explained that the stomachaches present right after as opposed to during visits because Edrich is "in a heightened state of anxiety during the visits, which is allowing him to stay surface level and not cause any problems during the visit. And then when he leaves the visit, he's able to relax. And then the adrenaline dump happens, which manifests as a stomachache for Edrich."

Dillard testified that he no longer believed therapeutic visits with Trevor would be beneficial due to "the defensiveness that Trevor experiences during those sessions when we start talking about the things that have disrupted the development for Edrich." Dillard explained further that "[i]t's got to be a mentality from the parent and a willingness to accept that in order to make repairs . . . they have to be different." However, Dillard had not observed that mentality in Trevor, and Dillard opined that "[T]revor needs to get in and talk with someone . . . to get his mental health under control."

On his own behalf, Trevor confirmed that he was moving out of his apartment and was "trying to get a place" in Cozad. Trevor testified that "I don't have a mental health issue" and indicated that there is nothing he would do differently "skill-wise or as a parent relationship" if he were to get the children back. Huyser questioned Trevor on whether he understood how his behavior and circumstances "could be contributing to some of [the children's] stress and anxiety." Trevor responded, "Yes, I do . . . but to me as long as the kids have food, water, electricity, and a roof over their heads and a bed to sleep in, really I don't see where there's a big concern about it."

The juvenile court ultimately adopted the recommendation of DHHS to add a secondary permanency objective of adoption. The court noted that the case had been open for roughly 12 months and "not a lot of progress has been made." The court found Dillard's testimony persuasive and emphasized the work needed to repair the parent-child relationship and restore a sense of safety for the children when they are with Trevor.

On June 8, 2022, Prentice wrote a letter advising the court that all visits between Trevor and the children would be suspended as of June 7, 2022. Prentice also relayed the following recommendation from Dillard in that regard:

> [O]ver the past couple of months there has been a slow regression from both Edrich and
> Anngelynn and this has been occurring in the home, in the school and daycare setting, and

it has been observed during the visits as well. After reviewing my notes along with consultation with a psychologist, I'm making the recommendation to immediately cease all visitations for Edrich and Anngelynn with both Trevor and Sharanna.

At the next hearing in early July 2022, the court received the DHHS case plan and court report dated June 29, 2022. Therein, DHHS recommended that the permanency objectives be modified to a primary objective of adoption and a secondary objective of reunification. DHHS reported a reemergence of "concerning behaviors" from Edrich including almost daily accidents "where he was wetting and pooping his pants." DHHS reported that Anngelynn had also been "having accidents soiling her pants frequently . . . [and] has struggled emotionally with any changes in planned visitation." Those behaviors led to Dillard's recommendation in early June to stop visits, and DHHS relayed the following update from Dillard as of June 29:

> Since stopping visits with both parents Anngelynn and Edrich's behaviors have reduced to almost nothing. Neither child has had any accidents in the past three weeks and Edrich's negative self-talk and aggressive behavior has stopped completely. It seems as though stopping visits has taken away all of the fear and anxiety the kids were experiencing. . . . I'm continuing to see them weekly for now and I have been able to have a good conversation with Sharanna about the recommendations however I have not been able to get ahold of Trevor.

DHHS further reported that Trevor had been compliant with drug testing but that each test continued to test positive for THC. Trevor had not yet obtained safe and stable housing, as he "reported that he has been living with friends and his biological mother and father in Cozad." Trevor reported employment with a different employer at each monthly team meeting. DHHS observed that "[w]ithin the reporting period team meetings have not been productive. . . . Trevor continues to be argumentative about most of his goals and reports he still doesn't know why the children were removed." DHHS reported on one specific incident between Trevor and Prentice in which law enforcement was called to intervene, and Prentice cancelled the visit that day due to Trevor's "very erratic behaviors." Trevor reported to DHHS that he was attending biweekly counseling sessions with a new therapist. Prentice testified that Trevor's therapist had recommended that he obtain a psychological evaluation, but that evaluation had not been done.

Huyser's report echoed the concerns of DHHS regarding the children's behaviors and referenced Dillard's assessment as to how the children's "insecure attachment" to Trevor was contributing to those behaviors. Huyser further opined that "Trevor has not demonstrated any change from previous behaviors; therefore, this insecure attachment is dangerous to Edrich and Anngelynn." Huyser emphasized Trevor's own mental health needs and his refusal to take appropriate action in that regard. Huyser went further than DHHS and recommended that the permanency objective of reunification be abandoned altogether.

The juvenile court adopted DHHS' recommendation to modify the permanency plan to a primary objective of adoption and a secondary objective of reunification. The court further noted that the case had been open for more than 15 months and found no exception to the filing of a motion for termination of Trevor's parental rights. Although, the court did order "some level of at least therapeutic visitation to start again."

The State filed a motion to terminate Trevor's parental rights in early August 2022. The motion alleged that termination was in the best interest of the children and that statutory bases for termination existed under Neb. Rev. Stat. § 43-292(6) and (7) (Reissue 2016). The hearing on that motion was held on September 8. Numerous witnesses testified to the nature of the children's problem behaviors, including that such behaviors were significantly more severe following visits with Trevor. Additionally, DHHS caseworkers testified at length regarding Trevor's lack of progress and his consistent refusal to cooperate with DHHS or take accountability for his role in the children's removal.

Dillard testified regarding his recent attempts to implement therapeutic visits in accordance with the court's order that some level of therapeutic visitation start again. However, Dillard observed that such visits were generally unproductive due to difficulty engaging Trevor in the process. Dillard became concerned about the children's regression to behaviors that had "reduced significantly" during periods of time that visits were suspended. Dillard testified that "[a]ll the ways that I have tried to work with Trevor to address . . . the traumas the kids have gone through, have been met with defensiveness, hostility, denying." For example, Dillard recalled a recent "parent feedback session" to discuss the regression in the children's behavior, and within "maybe ten minutes," Trevor "started blaming me and getting very frustrated, blaming [DHHS], blaming the team, and eventually walked out of the office."

Because Trevor was not receptive to Dillard's feedback, Dillard testified that he was forced to "basically stop challenging [Trevor] in the hopes that he might start opening up," but that never happened. Due to this lack of progress, Dillard could not recommend that it would be in the children's best interests to continue therapeutic visits with Trevor. Dillard added that "[a]t this point I don't know if there is anything else I can do." Dillard opined that removing the children from their stable environment with Nicholas and Michaela and placing them with Trevor at that point in time "would cause irreparable harm" and would likely cause "severe regression in their behaviors and emotional regulation." Dillard further opined that termination of Trevor's parental rights was in the best interests of the children.

The DHHS case manager at the time of the termination hearing, Alyssa Schneider, reiterated many of the concerns already discussed, including that Trevor continued to test positive for THC and that the children had regressed in their behaviors after therapeutic visits restarted. Schneider further testified that DHHS was not contemplating any other form of visitation at that time. Schneider ultimately expressed the position of DHHS that termination of Trevor's parental rights was in the best interests of the children. Following Schneider's testimony, the State rested its case.

Thereafter, a number of Trevor's friends and family members testified to their observations of Trevor with his children. Generally, each of the witnesses testified that Trevor seemed to have a positive relationship with his children and was able to provide for their basic needs. However, the testimony was largely limited to observations from prior to the children's removal in March 2021. On his own behalf, Trevor maintained that he had done "nothing wrong" and suggested that whatever trauma the children had experienced was the result of DHHS intervention.

The juvenile court took the matter under advisement and entered a written order terminating Trevor's parental rights in November 2022. With respect to the allegations under § 43-292(6), the court found that Trevor "generally failed to meet the goals of the case plan." The

court noted Trevor's persistent refusal to cooperate with DHHS and other service providers, adding that "offers of assistance [were met] with an attitude of belligerence and anger." While the court acknowledged that Trevor had been attending therapy sessions, it found that Trevor nevertheless failed to "demonstrate any significant improvement in his mental health, his ability to manage his anger, or his ability to properly parent his children." Altogether, the court found clear and convincing evidence in support of the allegations under § 43-292(6), as reasonable efforts had failed to reunify the family. The court also found clear and convincing evidence in support of the allegations under § 43-292(7), as there was no dispute that the children had been in an out of home placement for 15 or more of the most recent 22 months.

With respect to the best interests of the children, the court noted Trevor's lack of progress despite over 18 months of juvenile court involvement. The court emphasized the testimony as to the negative impact that visitation had on the children, as well as Dillard's unsuccessful attempts to implement therapeutic visits with Trevor. The court noted that it found Dillard's testimony "to be persuasive and compelling as to the harm which would be inflicted on the children were they to be reunified with [Trevor]." Ultimately the court found that Trevor "has repeatedly demonstrated that he does not have the skill or judgment to provide for the emotional, behavioral and physical needs of the children." Thus, the court found by clear and convincing evidence that termination of Trevor's parental rights was in the best interests of the children. Trevor appealed.

ASSIGNMENTS OF ERROR

Trevor assigns that the juvenile court erred in (1) finding that reasonable efforts failed to correct the conditions leading to the removal and adjudication of the children, (2) determining Trevor was unfit and that it was in the best interests of the children that his parental rights be terminated primarily because the children had been in out of home placement for 15 or more of the most recent 22 months, and (3) finding that it was in the children's best interests to terminate Trevor's parental rights.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

ANALYSIS

Under Nebraska law, terminating parental rights requires both clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and clear and convincing evidence that termination is in the best interests of the children. See *In re Interest of Donald B. & Devin B.*, 304 Neb. 239, 933 N.W.2d 864 (2019).

*Statutory Grounds for Termination.*

Trevor first assigns, restated, that the juvenile court erred in finding clear and convincing evidence of statutory grounds for termination under § 43-292(6). However, on appeal, Trevor "does not dispute that the children were in out of home care for more than fifteen months out of

- 9 -

the most recent twenty-two months." Brief for appellant at 11. Section 43-292(7) operates mechanically and does not require the State to adduce evidence of any specific fault on the part of the parent. See *In re Interest of Mateo L. et al., supra.* Any one of the bases for termination codified by § 43-292 can serve as a basis for termination of parental rights when coupled with evidence that termination is in the best interests of the children. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Thus, we conclude the State met its burden to prove statutory grounds for termination under § 43-292(7), and there is no need to address Trevor's arguments under § 43-292(6).

Trevor's second assignment of error alleges that the juvenile court "erred in finding that the length of time the children were out of home was proof of parental unfitness." Brief for appellant at 11. However, we disagree that the juvenile court made any such finding. To the contrary, the juvenile court explicitly noted in its order that "[t]he amount of time a child remains in out of home foster care, alone, does not prove a parent's unfitness," and the court emphasized the need for "clear and convincing evidence of current existing circumstances which show termination is nonetheless in the child's best interest." We find no merit in Trevor's second assignment of error.

*Best Interests.*

Lastly, Trevor assigns that the juvenile court erred in finding that termination of his parental rights was in the best interests of the children. Trevor's primary argument is that the juvenile court "placed undo emphasis" on Dillard's testimony. Brief for appellant at 12. However, Trevor fails to provide any reason as to why the juvenile court should have weighed Dillard's testimony any differently. Considering and giving weight to the fact that the juvenile court observed the witnesses, we find no error in the court's consideration of Dillard's testimony as it relates to the best interests of the children.

Moreover, even without Dillard's testimony, the record is clear that Trevor failed, despite ample opportunity, to rehabilitate himself and meaningfully address the safety concerns that resulted in the children's removal. When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra.* Furthermore, children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

Throughout the entirety of the present case, Trevor failed to understand the reasons for the children's removal and refused to accept responsibility for his role in that regard. While there was evidence that Trevor loved his children and that his children had formed an attachment to him, the evidence also showed that that attachment was unhealthy and harmful to the children. Despite the repeated efforts of DHHS caseworkers and the children's therapist, Trevor demonstrated that he was either unwilling or unable to take the actions necessary to repair the parent-child relationship and establish a safe and stable environment for the children. Upon our review of the record, we conclude the State met its burden to prove that termination of Trevor's parental rights was in the best interests of the children.

## CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Trevor's parental rights.

AFFIRMED.